TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4443/8452
     Facsimile:  (213) 894-0141
     E-mail:     lindsey.dotson@usdoj.gov
                 thomas.rybarczyk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 19-00567-PSG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | Hearing Date: January 7, 2022 |
| | Hearing Time: 1:30 p.m. |
| VARDAN KESHISHYAN, | Location:    Courtroom of the |
| | Hon. Philip S. |
| Defendant. | Gutierrez |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Lindsey Greer Dotson and Thomas F. Rybarczyk, hereby files its sentencing position for defendant VARDAN KESHISHYAN.

///

///

///

The government's sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 14, 2021              Respectfully submitted,

                                      TRACY L. WILKISON
                                      United States Attorney

                                      SCOTT M. GARRINGER
                                      Assistant United States Attorney
                                      Chief, Criminal Division


                                          /s/ Lindsey Greer Dotson
                                      LINDSEY GREER DOTSON
                                      THOMAS F. RYBARCZYK
                                      Assistant United States Attorneys

                                      Attorneys for Plaintiff
                                      UNITED STATES OF AMERICA

2

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

I.    INTRODUCTION.................................................1

II.   STATEMENT OF FACTS..........................................2

      A.   To Conceal Assets During a Divorce, Defendant
           Structured $99,400 Through 11 Cash Withdrawals
           of About $9,000 Each..................................2

      B.   A Bank Manager Warned Defendant That Structuring
           Was a Federal Crime; Defendant Continued to Structure
           Anyway................................................2

      C.   Defendant Lied Under Oath to Conceal the Missing
           Money.................................................3

      D.   Despite Warnings From a Judge That His Cash
           Transactions Were Potentially Illegal, Defendant
           Structured $99,000 Into His Accounts Through 11 Cash
           Deposits of $9,000 Each...............................4

III.  ARGUMENT....................................................6

      A.   The Government's Objection to the Presentence Report......6

      B.   The Nature and Circumstances of the Offense,
           Seriousness of the Offense, and Just Punishment
           for Defendant.........................................9

      C.   The History and Characteristics of Defendant............11

      D.   The Need to Promote Respect for the Law, Afford
           Adequate Deterrence, and Protect the Public From
           Future Crimes.........................................11

IV.   CONCLUSION.................................................12

i

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

To combat money laundering, fraud, and other crimes, federal law requires financial institutions to prepare and file Currency Transaction Reports ("CTRs") with the United States Department of the Treasury to report cash transactions in amounts greater than $10,000. It is a federal felony to structure a currency transaction greater than $10,000 by breaking the transaction into smaller ones with the intent to evade a bank's reporting requirements. Despite multiple warnings about the illegality of structuring, first from a bank manager and later from a state court judge, defendant VARDAN KESHISHYAN -- a federal law enforcement officer -- violated the law by structuring a total of $198,400 to conceal assets during his divorce.

Following a three-day trial, a jury convicted defendant of both counts of Structuring of Currency Transactions to Evade Reporting Requirements, in violation of 31 U.S.C. § 5324(a)(3). Count One pertained to defendant's structuring of a $99,400 transaction through 11 cash withdrawals of approximately $9,000 each. Count Two pertained to defendant's structuring of a $99,000 transaction through 11 cash deposits of $9,000 each.

As detailed herein, the correct Base Offense Level is 16, not 14 as the Presentence Report ("PSR") states. With the corrected offense level, defendant's United States Sentencing Guidelines ("Guidelines") range is 21 to 27 months. To punish, deter, and send a message to the community that crimes committed by federal law enforcement officers are serious and carry meaningful consequences, a mid-range sentence of 24 months' imprisonment is appropriate.

II.  **STATEMENT OF FACTS**[1]

A.  **To Conceal Assets During a Divorce, Defendant Structured $99,400 Through 11 Cash Withdrawals of About $9,000 Each**

Defendant's wife filed for divorce in November 2014.  On January 12, 2015, defendant deposited his share of the proceeds from the sale of the family home ($96,369.22) into a Bank of America account that he solely owned and controlled.  He then transferred $80,000 from that account into another Bank of America account he owned.  From January 22, 2015 to February 20, 2015, defendant traveled to numerous bank branches throughout Los Angeles County to make 11 separate cash withdrawals from those two Bank of America accounts.  His 11 cash withdrawals totaled $99,400.

B.  **A Bank Manager Warned Defendant That Structuring Was a Federal Crime; Defendant Continued to Structure Anyway**

Amid his flurry of cash withdrawals, a Bank of America manager confronted defendant about his banking activity.  Suspicious that he was structuring, the manager warned defendant about the bank's reporting requirements.  She told him that his attempted $9,000 cash withdrawal, following a pattern of similar cash withdrawals days earlier, would trigger a CTR.  As was her standard practice in these situations, she testified that she would have given defendant a pamphlet about structuring.  The one-page pamphlet, which was admitted at trial, warned that the Bank Secrecy Act requires banks to file CTRs for cash transactions greater than $10,000 and that it was a crime to break up a currency transaction into smaller ones to avoid

---

[1] The Statement of Facts is based on the evidence presented at trial.

those reporting requirements.  Rather than heed the manager's warning and stop structuring, defendant continued to break the law.  He cancelled the cash transaction at the bank branch where the manager was prepared to file a CTR and instead went to another, unsuspecting branch to make the $9,000 withdrawal.[2]

### C.  Defendant Lied Under Oath to Conceal the Missing Money

Once defendant had siphoned $99,400 from his accounts, this federal law enforcement officer lied under oath in a state court divorce proceeding in an attempt to explain why so much money was missing from his bank accounts.  During a hearing in June 2015, the state court judge inquired as to why the proceeds from the sale of the family home were not on defendant's "asset list."  The asset list was supposed to contain a comprehensive list of all of defendant's assets and would be used by the court to determine spousal support, child support, and other terms of the divorce; notably, for that hearing, the asset list would be used to determine whether defendant could afford to pay for a psychological evaluation for his children. Defendant falsely claimed, again under oath, that he had lost $95,000 from the sale of the family home and only had $1,000 remaining.  That was a lie.

His lie was clear from the transcript itself, which was admitted at trial.  Defendant claimed -- without any evidence or supporting documentation -- that he had given most of the missing money to a "friend" to flip houses as a real estate investment.  He made this

---

[2] As she testified at trial, the bank manager filed a Suspicious Activity Report referral form concerning defendant's suspicious behavior.  The PSR incorrectly states that she filed that form on February 29, 2015.  (PSR ¶ 12.)  However, according to the form itself, the manager submitted the form on February 9, 2015.

"investment," he claimed, even though the friend had never flipped a house and without any discussion of when the friend would repay defendant.  Defendant had no idea whether the friend actually invested the money but conveniently claimed that the friend had lost all of defendant's money and could not repay him.  Defendant also said that he had given his friend all the money in cash, so of course, the investment could not be traced or verified.  When the judge pressed defendant for corroboration, defendant said he had none -- no note, contract, text messages, emails, or any other supporting evidence whatsoever of this supposed investment.

As she testified at trial, the judge was skeptical of defendant's story.  And rightly so.  Not only was the story suspect on its face, but defendant's lie became crystal clear once the divorce became final.  Suddenly, as soon as the divorce terms were settled and defendant thought it less likely that his wife could get hold of his money, the supposedly "lost" money reappeared.  Out of nowhere, defendant suddenly had $99,400 in cash, which, as detailed herein, he deposited into his accounts through 11 cash deposits of $9,000 each.

> **D.  Despite Warnings From a Judge That His Cash Transactions Were Potentially Illegal, Defendant Structured $99,000 Into His Accounts Through 11 Cash Deposits of $9,000 Each**

During the June 2015 hearing, the state court judge inquired as to how defendant had withdrawn the missing funds from the bank for the supposed investment.  Upon learning that defendant had made small cash withdrawals over time instead of withdrawing the money in one lump sum, the judge warned him that transactions above $10,000 generate an "automatic notification" by the bank.  She also told him

that the government "investigate[s]" repeated withdrawals of cash, like the ones defendant was doing.  Just as the bank manager had done months earlier, the judge again put defendant on notice about the bank's reporting requirements and the illegality of structuring.

But defendant did not care.  This federal law enforcement officer willfully chose to continue structuring and thus continue violating the law.  As his divorce became final, defendant began structuring the supposedly "lost" funds back into his bank accounts. During a hearing in state court on August 18, 2016, the parties reached an agreement on the terms of the divorce.  The very next day, defendant deposited $9,000 in cash back into one of his Bank of America accounts.  Thereafter, once the court had issued the dissolution of marriage judgment on December 22, 2016, defendant made the remaining 10 cash deposits over an eight-day period in January 2017.  He deposited the cash into a Bank of America account and a Wells Fargo Bank account, both of which he solely owned and controlled.  Indeed, he had opened the Wells Fargo Bank account for the sole purpose of having another account at a bank other than Bank of America to conceal his structuring; he never used that Wells Fargo Bank account for anything other than depositing cash in $9,000 increments.

Defendant's structuring was clear and calculated.  On the days when defendant made the deposits, he visited both a Bank of America branch and a Wells Fargo Bank branch on the same day, sometimes just minutes apart, to make a $9,000 deposit at each bank location.  He made sure to never deposit more than $10,000 at any one time and traveled to bank branches all over Los Angeles County to conceal his pattern of cash transactions.  In total, between his August 19, 2016

deposit and the ten deposits in January 2017, defendant deposited $99,000 back into his accounts.

## III. ARGUMENT

### A.    The Government's Objection to the Presentence Report

The government objects to the PSR's Guidelines calculation. Although the government agrees that the Base Offense Level is six plus the number of levels from the table in U.S.S.G. § 2B1.1 (see PSR ¶ 23), the PSR incorrectly asserts that an eight-level increase from the table is appropriate here (id. at ¶ 25). Rather, a 10-level increase under U.S.S.G. § 2B1.1(b)(1)(F) is correct because the total amount of the structured funds exceeded $150,000.

Through the two structured cash transactions in Counts One and Two, the total amount structured was $198,400. Count One charged defendant with structuring $99,400. Count Two charged him with structuring $99,000. Although defendant first withdrew the cash to hide it during a divorce and later deposited a similar amount back into his accounts once the divorce was final, those are two separate instances of structuring. Under the Guidelines, the "value of the funds" means "the amount of the funds involved in the structuring or reporting conduct." U.S.S.G. § 2S1.3, cmt. n. 1. This is not about the total amount of money defendant hid during his divorce; it is about the amount of funds involved in the reporting conduct. Through two structured cash transactions, defendant prevented the banks from filing CTRs on 22 separate occasions to report a total of $198,400.

Multiple courts have rejected similar efforts by defendants to try to reduce the "value of the funds" for purposes of the Guidelines calculation. See, e.g., United States v. Abdi, 342 F.3d 313, 319 (4th Cir. 2003); United States v. Beras, 183 F.3d 22, 27-28 (1st Cir.

1    1999); <u>United States v. Builes</u>, 837 F. Supp. 490, 492 (N.D.N.Y.

2    1993).  The correct calculation of the "value of the funds" is the

3    total amount of money structured to reflect the scope of the harm to

4    society by each structured transaction.  See <u>United States v. Bariek</u>,

5    No. 01:05-CR-150-JCC, 2005 WL 2334682 at *2 (E.D. Va. 2005) ("The

6    proper measure of criminal responsibility generally is the harm that

7    the defendant caused[.]" (quotation marks and citation omitted)).

8    In <u>Abdi</u>, the Fourth Circuit stated: "The 'value of the funds' is the

9    **entire amount** of the funds that the defendant structured because that

10   is the amount 'involved in the structuring or reporting conduct.'

11   The value is not limited to the portion of the funds above $10,000 on

12   any given day, and **the provision grants no discretion to the court to**

13   **reduce the amount**."  <u>Abdi</u>, 342 F.3d at 319 (emphasis added and

14   citation omitted).

15          In analogous cases involving money laundering, for which

16   U.S.S.G. § 2S1.1 and the table in U.S.S.G. § 2B1.1 are also used to

17   calculate the Base Offense Level, the Eighth Circuit made clear that

18   the "value of the funds" is based upon the total amount of the funds

19   laundered.  <u>United States v. Martin</u>, 320 F.3d 1223, 1227 (11th Cir.

20   2003).  The Eighth Circuit explained:

21          Unlike the 1998 Sentencing Guidelines for theft or fraud, which
            compute the offense level according to the "loss" incurred by
22          the victim, <u>see</u> U.S.S.G. §§ 2B1.1(b)(1), 2F1.1(b)(1), the 1998
            Sentencing Guidelines for money laundering compute the base
23          offense level according to the "value of the funds," U.S.S.G. §
            2S1.1(b)(2).  "This is so because '[t]he harm from such a
24          transaction does not generally' fall upon an individual, but
            falls upon society in general.'"  <u>United States v. Thompson</u>, 40
25          F.3d 48, 51 (3d Cir. 1994) (citation omitted).  **Each unlawful**
            **monetary transaction harms society by impeding law enforcement's**
26          **efforts to track ill-gotten gains**.  <u>See</u> <u>United States v. Allen</u>,
            76 F.3d 1348, 1369 (5th Cir. 1996).
27

28

                                       7

1    Id. (emphasis added).  As with money laundering, it is each instance

2    of structuring that matters and must be accounted for when

3    calculating the "value of the funds."  This is because each instance

4    of structuring is the harm to society.  In affirming the district

5    court's Guidelines calculations in Martin, the Eighth Circuit stated:

6    "By adding together the individual transactions for which Appellant

7    was convicted, the district court's calculation accurately reflected

8    the scope of the criminal enterprise because each of the 97 money

9    laundering counts constituted a separate harm to society by further

10   impeding law enforcement's efforts to track the ill-gotten gains."

11   Id.

12        Not only do the plain language of the Guidelines and applicable

13   case law make clear that the "value of the funds" is based on the

14   total amount of the structured funds, commonsense dictates the same

15   conclusion.  Consider if defendant had heeded the judge's warnings

16   and stopped structuring after the 11 cash withdrawals charged in

17   Count One.  In that instance, there would be no Count Two because

18   defendant would not have structured the subsequent 11 cash deposits

19   totaling $99,000.  But under the PSR's interpretation of the

20   Guidelines, defendant would have the same Base Offense Level of 14.

21   By "not counting" the structured funds in Count Two, the PSR is

22   treating defendant the same as it would if he had only committed the

23   crime charged in Count One.  That is wrong.  A jury convicted

24   defendant of structuring two cash transactions for a total of

25   $198,400 in funds that the banks were prevented from reporting.  His

26   Guidelines range must reflect the jury's verdict and true scope of

27   defendant's conduct.  Indeed, even acquitted conduct can be "counted"

28   for sentencing.  United States v. Watts, 519 U.S. 148, 156-57 (1997).

The PSR's decision to "not count" the structured funds in Count Two treats defendant as though he had the good sense to not structure a second transaction, ignores the full extent of defendant's harm to society, and incorrectly measures his criminal responsibility.

Accordingly, because the total amount of the funds structured is greater than $150,000, his Base Offense Level is 16. U.S.S.G. §§ 2S1.3(a)(2), 2B1.1(b)(1)(F). With no other applicable enhancements, his Total Offense Level therefore is 16. Because defendant falls in Criminal History Category I, his correct Guidelines range is 21 to 27 months. For the reasons herein, a mid-range sentence of 24 months is appropriate.

**B. The Nature and Circumstances of the Offense, Seriousness of the Offense, and Just Punishment for Defendant**

In determining a sufficient sentence, courts must consider the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). Courts must also impose sentences that reflect the seriousness of the offense and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). For these reasons, it is both appropriate and imperative for the Court to impose the government's recommended sentence of 24 months in prison.

On 22 separate occasions, defendant -- a federal law enforcement officer -- went to a bank and chose to break the law. To conceal his scheme, he used four different bank accounts and traveled to 11 different bank branches all over Los Angeles County, hoping that no bank would catch on to his pattern of structured cash transactions. When a bank manager caught on to defendant's structuring, she warned him that she would have to file a CTR if he completed another cash transaction just shy of the $10,000 reporting requirement. She also handed him a one-page pamphlet defining structuring and warning that

it was against the law.  Rather than stop structuring, this law
enforcement officer continued his criminal endeavors but with more
caution.  He aborted the cash transaction at the bank branch with the
suspecting manager and instead went to a different branch to complete
the transaction.  And when a state court judge inquired as to why
nearly $100,000 was missing from the defendant's bank accounts (and
thus could not be allocated as part of the divorce), he lied.  He
made up a phony story about losing the money through a bad real
estate investment.  And worse, he continued to structure and commit a
federal felony even after that same judge warned him that what he was
doing gets "investigated" and was likely illegal.

At trial, defense counsel argued to the jury that reporting
requirements under federal law are "stupid," as if to suggest that
the crime of structuring is not a serious offense.  To be clear,
federal felonies are serious.  But the numerous aggravating factors
here make this structuring case particularly more egregious than
most.

First, defendant was a federal law enforcement officer.  Despite
his oath to upload the law, he willfully and repeatedly chose to
break it.  Second, defendant violated the law after not one, but two,
warnings that what he was doing was illegal.  One of those warnings
even came from a state court judge, and yet, even that admonishment
was not enough to deter defendant.  Third, this was not an errant
offense precipitated by a lapse in judgment on one occasion.
Defendant structured over a period of years, through 22 separate cash
transactions.  Fourth, defendant was calculating.  He opened accounts
to hide his banking activity and traveled to 11 separate bank
branches all over Los Angeles County to avoid detection.  Fifth,

defendant lied under oath in the state court divorce proceeding to try to conceal the structured funds, fabricating a story about supposedly losing the funds through a bad real estate investment. Contrary to everything defense counsel said in his closing argument, this case is anything but "stupid." It is serious, and a mid-range Guidelines sentence of 24 months will reflect that.

**C.   The History and Characteristics of Defendant**

The Court must also consider the history and characteristics of defendant. 18 U.S.C. § 3553(a)(1). This factor too weighs in favor of a mid-range Guidelines sentence of 24 months. Defendant had a happy childhood and maintains a close relationship with family. (PSR ¶¶ 45–46.) He has no substance abuse issues, nor any mental or emotional health problems. (Id. at ¶¶ 54–55.) Most of all, at the time he committed the offenses, he had a stable and respected job as a federal law enforcement officer. His crimes were borne, not of desperation, but greed. He wanted to hide money from his wife and was willing to break the law to do so.

**D.   The Need to Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public From Future Crimes**

Finally, any sentence must promote respect for the law, afford adequate deterrence, and protect the public from future crimes. 18 U.S.C. § 3553(a)(2). These are additional, compelling reasons warranting the 24-month sentence.

From the outset, defendant has refused to accept any responsibility for his conduct and has shown no remorse for his crimes. And as his own statements to the Probation Officer make clear, even the jury's verdict has not swayed him. He told the Probation Officer that he lost his job with Immigration and Customs

11

Enforcement "because of his wife."  (PSR ¶ 50.)  To be clear, defendant lost his job because of his own choices -- his choices to go to a bank on 22 separate occasions and violate federal law.  As the case agent's trial testimony made clear, the investigation originated with a Suspicious Activity Report ("SAR") documenting defendant's 22 cash transactions just shy of the $10,000 reporting requirement; defendant's wife had nothing to do with it.

Ultimately, defendant committed federal felonies while employed as a federal law enforcement officer and then tried to cover them up through perjury and deceit.  And yet, in spite of a trial that laid the evidence bare and the jury's guilty verdicts on all counts, defendant continues to downplay the severity of his conduct and blame others for his current situation.  His sense of victimhood and inability to accept responsibility are why a lengthy sentence is important.  For specific deterrence, any sentence must convey to defendant the severity of his crimes.  For general deterrence, a significant prison sentence will promote respect for the law and send a powerful message that financial crimes like structuring are not "stupid," as defense counsel argued at trial, and indeed carry meaningful punishment, particularly when committed by a federal law enforcement officer.

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 24 months in prison, followed by three years of supervised release.